JOSE LORRENTE ECHAVARRIA AND CARLOS ALFREDO GURRY, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 22354

September 3, 1992 839 P.2d 589

[Rehearing denied November 3, 1992]

*Schieck & Derke,* Las Vegas, for Appellant Jose Lorrente Echavarria.

*Morgan Harris,* Public Defender, and *David Wall,* Deputy Public Defender, Clark County, for Appellant Carlos Alfredo Gurry.

---

*Frankie Sue Del Papa*, Attorney General, Carson City; *Rex Bell*, District Attorney; *James Tufteland*, Deputy District Attorney; and *William Henry*, Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Echavarria shot and killed an FBI agent who was in the process of arresting Echavarria for attempted bank robbery. Gurry was identified as an accomplice and was arrested shortly after the incident at the Las Vegas apartment he and Echavarria shared. Echavarria fled to Mexico, but was apprehended by the Mexican authorities and returned to the United States. Echavarria and Gurry were each found guilty of, among other felonies, first-degree murder with the use of a deadly weapon. Echavarria was sentenced to death. Gurry received a sentence of life in prison with the possibility of parole. Both men appealed their convictions. Echavarria also appealed his sentences.

### Facts

On the morning of June 25, 1990, Jose Lorrente Echavarria, disguised as a woman and wearing a gauze pad on his cheek and a cast or sling on his arm, entered a Las Vegas branch of the Security Pacific Bank with the intention of robbing it. Echavarria previously had surveyed the bank and determined that no security guards were employed there. When Echavarria approached a bank teller and eventually pointed a gun at her, the teller screamed and jumped back from the counter, causing Echavarria to abandon his holdup attempt and start walking towards the exit door of the bank.

FBI Special Agent John Bailey, who happened to be at the bank on Bureau business at the time of the incident, inquired about the commotion. Upon learning that Echavarria had pulled a gun on a bank teller, Bailey turned to follow Echavarria, pulled out his gun, and yelled something akin to "halt, this is the FBI." Echavarria turned, glanced at Bailey, and continued to walk towards the exit. Bailey then fired a shot that shattered the bank's glass front door. Echavarria stopped. Bailey grabbed the gunman, held him against the wall, and ordered him to drop his gun, which Echavarria eventually did.

Acting swiftly, Agent Bailey frisked Echavarria, requested that someone call the FBI office, and asked a bank employee to retrieve his handcuffs from his car. Bailey seated Echavarria in a chair while he waited for the handcuffs. The bank employee returned with the cuffs, but before Bailey could shackle Echavarria, he jumped out of the chair and collided with Bailey.

During the ensuing scuffle, Bailey fell to the ground and Echavarria, retrieving his own gun, fired several shots at the downed agent. Echavarria then ran from the bank. Bailey was transported to a hospital, where he succumbed to three gunshot wounds.

The trial evidence supported the State's theory that after exiting the bank, Echavarria ran to his blue Firebird where the getaway driver, Carlos Alfredo Gurry, was waiting and the two sped away. A police officer who arrived at the crime scene shortly after Echavarria had fled discovered a motorcycle in the handicap parking space outside the bank. An investigation of the vehicle identification number on the motorcycle revealed Echavarria as the owner. A DMV check disclosed that the license plate attached to the motorcycle belonged to another vehicle. The rightful owner of the license plate identified Gurry as the person he had seen lurking around his motorcycle on two mornings shortly before the bank incident. Testing revealed Gurry's fingerprints on the stolen plate.

Information from a wallet which Bailey had removed from Echavarria during the frisk quickly led investigators to the apartment shared by Echavarria and Gurry. The license plate belonging to Echavarria's motorcycle and a screwdriver were found on the walkway in front of the apartment. Inside the apartment, clothes were strewn about the living room floor. In a dumpster outside the apartment police found a Security Pacific Bank Visa credit card application with both Echavarria's and Gurry's fingerprints on it, and a business card with C. Williams Costume Shop written on the back. When questioned, clerks at the costume shop remembered two Hispanic men who came into the store a few days before the attempted robbery and looked at afro wigs and arm casts, although they could not remember if the men purchased anything.

Gurry was arrested when he returned to his apartment the afternoon of the incident. Initially, Gurry, stated that he had been at a friend's house working on a car since 9:00 a.m. Later, Gurry told the FBI that he was scared and had lied about his first story. Gurry stated that he had actually borrowed Echavarria's car on the morning of June 25, 1990, to take care of an immigration problem and some errands, and that he thereafter spent the remainder of the morning at the apartment. Gurry reported that Echavarria, looking desperate, came into the apartment about noon, changed clothes and left in a hurry. Gurry said that Echavarria's behavior frightened him, so he called a friend to pick him up. Gurry allegedly stayed about half an hour at the friend's house, then returned home.

Meanwhile, Echavarria headed south in his blue Firebird, arriving at the home of a former girlfriend in Juarez, Mexico, in

the early morning of June 26, 1990. Echavarria convinced the former girlfriend, Maria Garcia, to give him six hundred dollars before leaving. Echavarria next contacted Maria's brother, Jorge Garcia, for help. Jorge bought an airline ticket for Echavarria and took him to the airport. At Echavarria's request, Jorge also buried two guns and abandoned the blue Firebird along the highway.[1]

The Juarez police arrested Echavarria at the airport at about 8:30 p.m. on June 26, 1990. The next morning, Echavarria signed a written statement confessing to the murder of Agent Bailey. Echavarria was turned over to the FBI after his confession, and subsequently returned to the United States.

Echavarria and Gurry were each indicted on five counts: first-degree murder with the use of a deadly weapon, burglary, attempted robbery, escape and conspiracy. The State had to conduct a second grand jury to indict Gurry because the district court found that the evidence against Gurry in the first grand jury was insufficient and the prosecutor had misled the grand jury and failed to present exculpatory evidence.

Before trial, Echavarria moved to suppress his Juarez confession on the grounds that he had confessed after being subjected to physical torture and abuse while in the custody of the Mexican authorities. After a two-day evidentiary hearing, the motion was denied.

Trial commenced on March 15, 1991, and the guilt phase concluded with jury verdicts of guilty on all counts against Echavarria. Gurry was found guilty of all counts except the escape charge, which the district court had dismissed for lack of evidence.

After the penalty phase of the trial, the jury found three aggravating circumstances relating to the murder committed by Echavarria and sentenced him to death. The jury found four mitigating circumstances in favor of Gurry and sentenced him to life in prison with the possibility of parole.[2] The district court also sentenced each appellant to additional prison time for the other felonies. Appellants' motion for a new trial was denied.

## Discussion

Each appellant raises several allegations of error. Those raised

---

[1] The guns were later recovered by the Mexican authorities and turned over to the FBI. One of the guns fired the bullets which killed Agent Bailey. The other had been purchased by Gurry from a co-worker in late May, 1990. The Firebird was also recovered and searched, revealing the fingerprints of Echavarria and Gurry, and fragments of glass consistent with the glass in the bank door.

[2] Gurry received a second life term as a deadly weapon enhancement.

by both appellants will be treated first, followed by assignments of error relating to Echavarria, and then Gurry.

*Juror misconduct.*

Both appellants raise allegations of juror misconduct, although Gurry challenges only the jurors' conduct during the guilt phase of the trial, while Echavarria contends that misconduct occurred during both the guilt and penalty phases. These allegations were considered in connection with a motion for a new trial which was denied by the district court after an evidentiary hearing.[3]

The allegations of juror misconduct are primarily based upon the testimony of juror Ardys Pool, who contacted defense counsel after the trial concluded and disclosed the following purported instances of impropriety by certain jurors.

Juror Charles Ivy, who served as foreman, failed to indicate on a written questionnaire or during voir dire that he had been the victim of a crime. At the evidentiary hearing on juror misconduct, Ivy admitted mentioning to some of the other jurors during a recess that he had been in a fight as a youth many years ago in which he was beaten by men with tire irons and hospitalized. Ivy indicated that he did not consider himself to be a victim of a crime, but instead considered the incident a fight.

In Lopez v. State, 105 Nev. 68, 89, 769 P.2d 1276, 1290 (1989), we stated that when a juror fails to reveal potentially prejudicial information on voir dire, the relevant question is whether the juror is guilty of intentional concealment, the answer to which "must be left with the sound discretion of the trial court." As Ivy's testimony indicates that he did not view the 24-year-old incident as a criminal act, the district court was well within its discretion in determining that Ivy did not intentionally conceal information from the court.

Juror Thomas Stramat, upon learning that he was a potential juror in a capital case, went to the public library and looked up the definition of murder. He also examined a Catholic Encyclopedia which he kept in his home concerning murder and capital punishment. He recorded his finding and carried them with him throughout the trial and deliberations. He did not show his findings to the other jurors, although he did comment that his

---

[3]The evidentiary hearing was conducted by Judge Leavitt after Judge Lehman voluntarily recused himself following a motion by Gurry to disqualify him.

religion and his training allowed him to consider the death penalty if the court so instructed him.

We agree with the district court's determination that Stramat's actions were not inconsistent with his role as a juror. Stramat stated that his purpose in doing the research was to determine if he could, in accordance with his religious faith, serve as a juror in a capital case. Stramat also stated the he considered the instructions on the law given by the judge superior to his own research. Stramat's actions indicate that he took his responsibility as a juror seriously, and wanted to be certain that there would be no religious impediments to his ability to evaluate the evidence and reach a verdict in accordance with what the evidence and the law might dictate. Juror Stramat's actions were neither improper nor prejudicial.

Pool also alleged that some of the jurors were watching news reports of the trial. These allegations were denied at the evidentiary hearing, although one juror readily admitted that his wife was taping the news coverage of the trial, and that he had offered to make the tape available to other jurors after the trial concluded.

Generally, for this court to examine charges of prejudicial juror misconduct based on exposure to media coverage, there must be a showing that a member of the jury has been exposed to media communications and has been influenced by it. Arndt v. State, 93 Nev. 671, 675, 572 P.2d 538, 541 (1977). Here, there was no reliable evidence that jurors had watched or read any news accounts, or were aware of the contents of any such accounts or were in any way influenced by media reporting of the trial proceedings. Since there was no evidence that appellants were prejudiced by media reports, no basis exists for overturning the district court's refusal to grant a new trial based upon media exposure. *See* Barker v. State, 95 Nev. 309, 313, 594 P.2d 719, 721-22 (1979) (it is within the trial court's province to decide whether a defendant has been deprived of an impartial jury by juror misconduct).

Finally, Echavarria alleges that Pool revealed to defense counsel in a post-trial interview that she only voted for the death penalty because she thought the verdict would be overturned on appeal due to juror misconduct. At the evidentiary hearing, the court excluded Pool's statements regarding her reason for voting for the death penalty as violative of NRS 50.065(2), which prohibits consideration of affidavits or testimony of jurors concerning their mental processes or state of mind in reaching the

verdict. *See* Riebel v. State, 106 Nev. 258, 263, 790 P.2d 1004, 1008 (1990). We agree that the district court properly excluded evidence of Pool's mentation in deciding upon a verdict.

*Constitutionality of the reasonable doubt instruction.*

Echavarria and Gurry contend that Nevada's statutory jury instruction on reasonable doubt is unconstitutional. We have previously determined to the contrary. NRS 175.211, the instruction at issue, satisfies the due process requirements of the United States and Nevada Constitutions. Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991); *see also* Felder v. State, 107 Nev. 237, 810 P.2d 755, *cert. denied,* 112 S.Ct. 222 (1991); Riley v. State, 107 Nev. 205, 808 P.2d 551 (1991).

*Admissibility of the confession given by Echavarria to Mexican authorities.*

Echavarria contends that the district court erroneously admitted into evidence his confession to Juarez police officers. At the evidentiary hearing on the matter, Echavarria insisted that he signed the confession only as a result of interrogation and torture by the Mexican authorities. He also stated that United States agents cooperated and collaborated in the torture efforts. The alleged torture included beatings and electrical shocks to the genital area.

The district court determined that the confession was voluntary. In addition, the court instructed the jurors to determine for themselves whether the confession was voluntary and if not, to disregard it in their deliberations. On appeal, Echavarria continues to ascribe error to the district court's refusal to suppress the Juarez confession.

"A confession is admissible as evidence only if it is made freely, voluntarily, and without compulsion or inducement." Franklin v. State, 96 Nev. 417, 421, 610 P.2d 732, 734 (1980). A criminal conviction based in whole or in part upon an involuntary confession is a denial of due process, even if there is ample evidence aside from the confession to support the conviction. Jackson v. Denno, 378 U.S. 368 (1964). Therefore, our examination of this issue occurs without reliance on the overwhelming evidence of Echavarria's guilt.

Echavarria's allegations of physical abuse are not taken lightly by this court. However, our review of the record of the suppression hearing convinces us that the admission of Echavarria's confession was proper. The district court heard two days of

conflicting testimony about the voluntariness of the confession obtained in Mexico, and determined that Echavarria's testimony was not credible. The trial umpire was in a better position than this court to judge the truthfulness of Echavarria's testimony vis-a-vis the evidence produced by the State. Factors militating against Echavarria's testimony included the absence of physical marks consistent with the beatings he allegedly suffered, the testimony of witnesses who refuted Echavarria's version of the events, Echavarria's failure to immediately report the alleged abuse to authorities, and inconsistencies in Echavarria's testimony.

> Where pure factual considerations are an important ingredient [in evaluating the voluntariness of a confession, which is true in the usual case, appellate review . . . is, as a practical matter, an inadequate substitute for a full and reliable determination of the voluntariness issue in the trial court and the trial court's determination, *pro tanto,* takes on an increasing finality.

*Jackson,* 378 U.S. at 390-91. The conclusion by the district court that the confession was not coerced is supported by substantial evidence and we will not disturb it on appeal. *See* Franklin v. State, 96 Nev. 417, 421, 610 P.2d 732, 735 (1980).

*Limitation of the right of allocution.*

During the penalty hearing, Echavarria expressed his desire to make an unsworn statement to the jury. The district court agreed to allow such a statement, but cautioned that Echavarria could not attempt to dispute facts in issue or offer facts to exculpate himself. Echavarria decided that he could not effectively express himself under such constraints and chose instead to testify under oath.

Echavarria now contends that the district court's limitation on his unsworn statement violated his right to allocution. In Echavarria's view, the right of the defendant to informally address the jury should not be limited. He claims that "the defendant has an unbridled right to introduce competent evidence in mitigation . . . includ[ing] an unrestricted right to allocution should [the] same be the decision of the defense in lieu of sworn testimony." Contrary to Echavarria's assertion, the right of allocution is not without constraints.

We recently discussed the boundaries of a defendant's right of allocution in Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992). Capital defendants in the State of Nevada enjoy the

common law right of allocution, which is recognized as "the right of the defendant to stand before the sentencing authority and present an unsworn statement in mitigation of sentence, including 'statements of remorse, apology, chagrin, or plans and hopes for the future.'" *Id.* at 133, 825 P.2d at 604 (quoting DeAngelo v. Schiedler, 757 P.2d 1355, 1358 (Or. 1988)).

The right of allocution is not intended to provide a convicted defendant with an opportunity to introduce unsworn, self-serving statements of his innocence as an alternative to taking the witness stand. The proper place for the introduction of evidence tending to establish innocence is in the guilt phase of trial. At the penalty phase, the defendant's guilt has already been assessed and is no longer in issue. *See Homick* at 133, 825 P.2d at 604. The district court is obligated to instruct a defendant on the limits of allocution, and to inform him that a statement which transcends permissible bounds "will be subject to corrective action by the court." *Homick* at 134, 825 P.2d at 605 (quoting State v. Zola, 548 A.2d 1022, 1046 (N.J. 1988), *cert. denied,* 489 U.S. 1022 (1989)).

If Echavarria had managed to present the same information in an unsworn statement that he did under oath, he would have been subject to corrective action by the court, including possible cross-examination, as he disputed some of the testimony which had been introduced, offered new evidence and asserted that some of the State's witnesses had lied. *See Zola* at 1045 (right of allocution does not permit defendant to rebut facts in evidence, to deny his guilt, or to voice an expression of remorse that contradicts evidentiary facts). The district court's admonition to Echavarria concerning the scope of his statement in mitigation was proper and not a denial of Echavarria's right of allocution.

*Mandatory statutory review.*

Finally, regarding Echavarria, we conclude, pursuant to NRS 177.055, that (1) the evidence fully supports the finding of three valid aggravating circumstances, (2) that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor, and (3) that the sentence is not excessive, considering both the crime and the defendant.

*Prosecutorial misconduct.*

Gurry contends that he was prejudiced by prosecutor William Henry's misconduct during various stages of the proceedings against him. We determine that none of Gurry's allegations merit reversal. The first grand jury indictment against Gurry was dis-

missed, thus vitiating any misconduct. Gurry claims that the prosecution failed to present favorable portions of two different witnesses' testimonies at the second grand jury. However, even if the disputed testimony had been before the grand jury, there was sufficient evidence to sustain the indictment. The efficacy of an indictment can be sustained upon "the slightest sufficient legal evidence." Franklin v. State, 89 Nev. 382, 387, 513 P.2d 1252, 1256 (1973). Any irregularities which may have occurred in the second grand jury proceeding were cured when Gurry was tried and his guilt determined under the higher criminal burden of proof.[4]

We have also examined Echavarria's and Gurry's allegations of prosecutorial misconduct during the trial, and conclude that any misconduct which might have occurred was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967); see also NRS 178.598 ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"); Williams v. State, 103 Nev. 106, 111, 734 P.2d 700, 703 (1987) (harmless prosecutorial misconduct does not justify reversal). The instances of alleged misconduct were minor and did not detract from the substantial body of evidence reflecting appellants' guilt.[5]

*Refusal to allow Gurry's eyewitness identification expert to testify.*

Gurry's primary grievance concerns the district court's refusal to admit the testimony of Dr. Elizabeth Loftus, a professor of psychology at the University of Washington and a recognized expert in the field of identification evidence and witness recall. Gurry sought to introduce the rejected testimony because of the

---

[4]At trial, the disputed portions of the witnesses' testimony were made known to the jurors, who nevertheless found Gurry guilty. The Supreme Court has suggested that a jury verdict of guilty may render harmless an error in the grand jury proceedings. See United States v. Mechanik, 475 U.S. 66, 71-73 (1986). See also Sheriff v. Keeney, 106 Nev. 213, 216, 791 P.2d 55, 57 (1990) (substantial prejudice to defendant must be demonstrated before invading the province of the grand jury); People v. Towler, 641 P.2d 1253 (Cal. 1982) (defendant must show actual prejudice to reverse a grand jury indictment on appeal).

[5]Gurry complains that the prosecutor should have recalled a witness who reportedly misstated his testimony. The argument is without merit. Defendant recalled this witness, thus obviating the prospect of prejudice. Echavarria complains that he was prejudiced by the prosecutor's use of the phrase "savage blood lust" in the penalty phase as a reason for killing Agent Bailey. The impact of the phrase over a four-week trial, especially when the jury was instructed to disregard it, provides no basis for concluding that Echavarria was deprived of a fair trial.

varied and conflicting descriptions of the driver of the "getaway vehicle," and the lack of any reliable pre-trial identification of Gurry. Dr. Loftus' testimony would have addressed "the processes of perception, memory and retrieval, as well as specific circumstances effecting [sic] the accuracy of identification." In addition, Dr. Loftus would have testified concerning problems associated with cross-cultural identifications and how future identifications may be tainted by showing a witness a photograph of an individual or providing the witness with post-event information.

In United States v. Amaral, 488 F.2d 1148, 1153 (9th Cir. 1973), the criteria for permitting expert testimony on eyewitness identification were set forth, and include: (1) a qualified expert; (2) a proper subject; (3) conformity to a generally accepted explanatory theory; and (4) probative value compared to prejudicial effect.[6]

We conclude that the proffered testimony of Dr. Loftus met the *Amaral* criteria and should have been allowed. Unlike the situation in Porter v. State, 94 Nev. 142, 576 P.2d 275 (1978), where proffered expert eyewitness identification testimony was justifiably excluded, here the State conceded Dr. Loftus' expertise and there was considerable doubt about the reliability of the State's primary identification witnesses against Gurry.

Bernice Oertell, one of the State's chief witnesses, testified that she was at the bank next door to Security Pacific around noon on the day of the incident and she observed a blue, metallic sports car zoom through the parking lot and a 5'3" tall 125-130 pound Mexican man exit the car and jump up and down yelling "óver here, over here."[7] Oertell then observed an individual she thought was a woman run from Security Pacific, jump over a row of bushes and run to the passenger side of the car. Fearing the bank had been robbed, she asked a teller at her bank to call the police. In court, Oertell identified Gurry as the driver of the vehicle. However, Oertell had seen Gurry's picture on television the night of the incident.

The owner of the license plate found on Echavarria's motorcycle, who testified that Gurry was the man he had seen lurking around his motorcycle a few days before the attempted robbery, never picked Gurry out of a lineup, but made his identification when he saw a picture of Gurry in the newspaper the day after the incident. Prior to identifying Gurry, the witness described the

---

[6]Relying on the *Amaral* decision, the Arizona Supreme Court determined that Dr. Loftus had erroneously been precluded from testifying in a case in that state. State v. Chapple, 660 P.2d 1208 (Ariz. 1983).

[7]Counsel represented that Gurry is approximately 5'3" tall, Cuban, and weighed roughly 130 pounds at the time of the incident.

man he had seen as 5'6" and weighing 185 pounds. Additionally, Gurry's employment supervisor testified that Gurry would have been missed at work if he had taken a break of sufficient duration to travel to and from the location where the license plate was stolen.[8]

Other witnesses gave descriptions of Gurry which ranged from a 5'2" Hispanic to a 5'10" Caucasian. No witnesses were able to identify Gurry as the driver from a pictorial lineup. Most, if not all, of the identifications were cross-cultural.

Given the conflict in evidence concerning the pre-arrest identifications of Gurry in this case, the district court erred in not allowing Gurry's expert to testify. The substance of the proposed testimony was relevant to the identification of Gurry as Echavarria's accomplice and most likely would have been helpful to the jury. *See* NRS 50.275. However, eyewitness identifications aside, the remaining evidence linking Gurry to the crime was clearly of a qualitative magnitude that renders harmless the error in excluding Gurry's expert. Particularly compelling is the fact that Gurry took off work the morning of the incident, and lied about his whereabouts to law enforcement officers. Gurry's fingerprints on the stolen license plate as well as the one belonging to Echavarria's motorcycle also strongly implicate Gurry. Various items found in the roommates' apartment and the dumpster outside also tie Gurry to the crime. Although none of these evidentiary items standing alone conclusively established Gurry's involvement, the sum of the evidence presented at trial was sufficient to establish beyond a reasonable doubt that Gurry participated in the planning and commission of the attempted bank robbery which resulted in the tragic death of Agent Bailey.

### Gurry's gun ownership.

The district court permitted the State to introduce evidence that one of the guns taken to Mexico by Echavarria and recovered by the Mexican authorities was purchased by Gurry about a month before the incident at Security Pacific Bank.[9]

Because Gurry's gun was not connected in any way to the

---

[8] Gurry worked the 3:00 a.m. to 11:00 a.m. shift in the laundry room of the Hilton Hotel.

[9] The district court had earlier granted Gurry's motion in limine to exclude the fact of Gurry's gun ownership, then reversed itself two weeks into the trial, reasoning that the introduction of a statement by Echavarria that Gurry was not involved in the crimes in any way made the issue of the ownership of the gun more probative.

crime scene or to Gurry's presence there, evidence of Gurry's ownership of the gun was only of peripheral relevance and should have been excluded. However, because of the substantial body of other evidence linking Gurry to the crime, we conclude that the error was harmless.

*Deadly weapon enhancement.*

Gurry contends that the second consecutive life sentence imposed as a deadly weapon enhancement was improper. He cites as error the district court's rejection of his proffered jury instruction regarding the circumstances under which an unarmed aider or abettor may be found to have used a deadly weapon.[10] Gurry's proposed instruction was based upon language from our opinion in Anderson v. State, 95 Nev. 625, 600 P.2d 241 (1979).

Although Gurry was entitled to have the jury instructed on the law relating to this subject, the district court determined that the proffered instruction was confusing and misleading and offered to give another instruction taken directly from *Anderson.* Gurry refused this instruction and elected instead not to have the jury instructed on the subject. As the instruction suggested by the district court would have adequately covered the enhancement element, the failure to give Gurry's proffered instruction was not reversible error.

*Application of the felony murder rule to an aider and abettor.*

Gurry argues that his conviction of first-degree murder was improperly based upon the felony murder rule in this instance because the felonies in which he participated ended before the murder occurred, when Echavarria abandoned his robbery attempt. However, the crime of robbery includes acts taken to facilitate the perpetrator's escape. *See* Payne v. State, 81 Nev. 503, 507, 406 P.2d 922, 925 (1965). Under the facts of this case, there is ample evidence to support the conclusion that the murder took place during the chain of events which constitutes the attempted robbery, thus subjecting Gurry to the felony murder rule as an aider and abettor. *See* Archibald v. State, 77 Nev. 301, 362 P.2d 721 (1961) (homicide occurred during perpetration of robbery when defendant robbed service station attendant in California, kidnapped him, and killed him in Nevada).

---

[10]Gurry's proffered jury instruction stated:

[T]o find an aider and abettor in constructive possession of a weapon used by the principal offender, the unarmed aider and abettor must have knowledge of the other offender's being armed and the unarmed offender must have the ability to exercise control over the firearm.

We have carefully examined appellants' numerous other assignments of error and determine that they lack merit.

For the reasons discussed above, we have concluded that both Echavarria and Gurry were fairly tried and sentenced. We therefore affirm the judgments of conviction and sentences in their entirety.