926 P.2d 291 (1996)
Sean Deandre WHITE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 25516.
Supreme Court of Nevada.
November 7, 1996.
*292 Woodburn & Wedge and James William Erbeck, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, James Tufteland, Chief Deputy District Attorney, Robert Langford, Deputy District Attorney, Clark County, for Respondent.

OPINION
SPRINGER, Justice:
Sean White stands convicted of murder with use of a deadly weapon, conspiracy to commit murder, conspiracy to commit robbery and attempted robbery with the use of a deadly weapon. Three witnesses identified White as the man who shot and killed a man in the course of a robbery in a Las Vegas parking garage. From all appearances, it was not necessary for White to kill his robbery victim in order to carry out the robbery; and this crime comprises a particularly atrocious example of arbitrary, uncalled-for cold-blooded murder.
White's first claim of error is that the district court refused to admit expert testimony on certain psychological factors relating to reliability of eyewitness identification. Although the dissenting justice believes that White was prejudiced by reason of the jury's not receiving opinion evidence on such psychological phenomena as "unconscious transference," we conclude, given the firm identification of White by three witnesses, that White received a fair trial.
It is true, as stated in the dissent, that expert testimony may "assist the trier of fact" in some cases; but the trial judge was in the best position to judge whether or not the jury was in need of this kind of assistance. It is also true that in Echavarria v. State, 108 Nev. 734, 839 P.2d 589 (1992), we reversed a conviction because of the trial court's rejection of expert testimony of psychological evidence relating to identification, holding that "there was considerable doubt about the reliability of the State's primary identification witness against [the defendant]." Id. at 746, 839 P.2d at 597. Here there is no such "considerable doubt." Three witnesses gave similar descriptions of White as the assailant, two of whom identified White in a physical line-up. The victim's wife testified that she saw White shoot her husband. A hotel employee heard a gunshot and saw a man he identified as White run from the parking lot and into a white car. A hotel security guard saw a man she identified as White go into the parking lot and later heard a gunshot coming from the parking lot. This witness saw White leave the parking lot and get into a white car. This case is very much different from Echavarria. "Decisions regarding the admissibility of expert testimony lie within the discretion of the trial court." Emmons v. State, 107 Nev. 53, 56, 807 P.2d 718, 720 (1991). We decline to disturb the verdict in this appeal.
White's other claim of error is that the trial judge should have declared a mistrial because of certain remarks reported to have been made by a juror during penalty deliberations.[1] After this was reported to the court, the jury took no further action with regard to the penalty and was dissolved without having arrived at a penalty verdict. The question is, then, whether the jury's verdict in the guilt phase should be set aside by reason of the remarks attributed to this juror during deliberations in the penalty phase.
The trial judge, a highly respected jurist of Afro-American descent, ruled that "those comments, while unfortunate, do not in an of *293 itself indicate the defendant himself did not have a fair trial as far as I can see at this time." Although, as the dissent points out, a defendant is constitutionally entitled to an impartial jury, we are unwilling to say that Judge Addeliar Guy, who was present and was much more aware of the circumstances relating to this incident than are the members of this appellate tribunal, abused his discretion in refusing to grant a new trial. We therefore affirm the judgment of the trial court.
STEFFEN, C.J., and YOUNG and SHEARING, JJ., concur.
ROSE, Justice, dissenting:
I respectfully dissent for two reasons. First, the majority misconstrues and misapplies the holding in Echavarria v. State, 108 Nev. 734, 839 P.2d 589 (1992). Second, the blatant racial prejudice of some jurors denied White the right to an unbiased jury.
The first issue is whether the district court exceeded its discretion when it disallowed expert testimony regarding factors that affect the reliability of eyewitness identification. White offered the expert testimony of Dr. Steven Clark, a cognitive psychologist. Dr. Clark would have explained how certain factors affect eyewitness identification, such as duration of observation, expectations, stress, cross-racial identification, identification procedures, weapon focus, and the "forgetting curve." The district court refused to admit Dr. Clark's testimony.
The criteria for permitting expert testimony on the reliability of eyewitness identification include: (1) a qualified expert; (2) a proper subject; (3) conformity to a generally accepted explanatory theory; and (4) comparison of probative value to prejudicial effect. Id. at 746, 839 P.2d at 597. Clearly, all four elements were present in this case. First, Dr. Clark is a qualified expert. He is an assistant professor of psychology at the University of California, Riverside. As a cognitive psychologist, Dr. Clark researches the mental processes that underlie decision making, memory, recognition, and attention. Dr. Clark has published twelve articles on identification and memory and has testified as an expert in cognitive psychology on five occasions. The State's suggestion that Dr. Clark is not a qualified expert borders on ridiculous.
Second, testimony on the reliability of eyewitness identification is a proper subject of expert testimony. Expert testimony is permissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." NRS 50.275. NRS 50.275 seeks to "provide the trier of fact a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." Townsend v. State, 103 Nev. 113, 117, 734 P.2d 705, 708 (1987). An average juror would not be familiar with all the variables regarding identification and memory about which Dr. Clark intended to testify.
Dr. Clark planned to testify about unconscious transference, which occurs when a witness observes a person in one context and later believes that she or he saw the same person under entirely different circumstances. The Arizona Supreme Court reasoned that trial courts should admit expert testimony regarding unconscious transference because a court cannot "assume that the average juror would be aware of" unconscious transference. State v. Chapple, 135 Ariz. 281, 660 P.2d 1208, 1221 (1983). Dr. Clark explained that if a witness were to see a suspect's photograph several times prior to identifying the suspect, the witness might be identifying the suspect based on the photograph rather than a memory of the original event. Unconscious transference is especially relevant to the immediate case because all three witnesses saw either White's photograph or White himself in another context before they identified him.
Dr. Clark would have testified about a phenomenon known as the "forgetting curve." Research reveals that witnesses tend to forget most of the observed information very soon after the event and then the "[f]orgetting ... tends to level out." Id. 660 P.2d at 1220. An average juror is not familiar with this phenomenon, and trial courts should not deprive jurors of information about it. Id. Considering that the witnesses in the present case at first failed to identify White but later identified him as the perpetrator, *294 the jury would have benefited from information regarding the forgetting curve.
Dr. Clark intended to testify about the effect of stress upon eyewitness identification. People typically believe that witnesses recall stressful situations more accurately than normal occurrences. Id. at 1221. Research shows, however, that witnesses are less likely to observe accurately under stressful circumstances and that stress distorts a witness's ability to recall an event clearly. Id. The effect of stress was a relevant consideration in regard to Vicki Davenport, who was present when her husband was shot, and Marie Mesday, the security guard at the hotel parking lot, who testified that her "adrenaline was going" when the shooting occurred.
Dr. Clark would have testified on the inaccuracy of cross-racial identifications. Studies show that "own-race/other-race" recognition rates vary by as much as thirty percent, and one study found that people who tried to identify persons of another race made four times as many errors as those who tried to identify members of their own race. Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L.Rev. 934, 942-43 (1984). The California Supreme Court concluded that the difficulties underlying cross-racial identification are "counterintuitive" and that "few jurors realize the pervasive and even paradoxical nature of [the] `own-race effect.'" People v. McDonald, 37 Cal.3d 351, 208 Cal.Rptr. 236, 247, 690 P.2d 709, 720-21 (1984). The information on cross-racial identification is "sufficiently beyond common experience" that expert testimony on own race/other race recognition rates may "assist the trier of fact." Id., 208 Cal.Rptr. at 248, 690 P.2d at 721. Dr. Clark's testimony on cross-racial identification was particularly appropriate in the immediate case because the shooter was African-American, while Vicki Davenport and Mesday are not.[1]
Third, the State concedes that the theories on which Dr. Clark would have testified were generally accepted explanatory theories. Finally, Dr. Clark's testimony is clearly more probative than prejudicial. White's conviction was based entirely upon eyewitness identifications that are all to some degree problematic. Therefore, the district court should have considered the danger of wrongful conviction inherent in reliance upon such evidence. As Judge McGowan noted, mistaken eyewitness identification presents "conceivably the greatest single threat to the achievement of our ideal that no innocent [person] shall be punished." Carl McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L.Rev. 235, 238 (1970).
Courts have long recognized that eyewitness testimony is highly unreliable. United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"); Chapple, 660 P.2d at 1222 (admitting expert testimony is worthwhile in a case where "one of the key factual disputes to be resolved involved the accuracy of the eyewitness identification"). Psychologists have gathered empirical evidence proving the inaccuracy of eyewitness identification. An increasing number of courts, including this court, have responded to this growing body of psychological evidence by directing trial courts to admit expert testimony on the factors affecting the reliability of eyewitness testimony.[2]See *295 Echavarria v. State, 108 Nev. 734, 839 P.2d 589 (1992); Chapple, 660 P.2d at 1208; McDonald, 208 Cal.Rptr. at 246, 690 P.2d at 719; Campbell v. People, 814 P.2d 1 (Colo. 1991). When a trial court refuses to admit such expert testimony, it deprives
jurors of the benefit of scientific research on eyewitness testimony [and] forces them to search for the truth without full knowledge and opportunity to evaluate the strength of the evidence. In short, this deprivation prevents jurors from having "the best possible degree" of "understanding of the subject" toward which the law of evidence strives.
Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan. L.Rev. 969, 1017-18 (1977).
In Echavarria, this court concluded that because of "the conflict in evidence concerning the pre-arrest identification" of the appellant, the district court erred in excluding expert testimony regarding eyewitness identification. Echavarria, 108 Nev. at 747, 839 P.2d at 598. In the instant case, the pre-trial identifications of White give cause for some doubt. Less than three weeks after the murder, Vicki Davenport attended a physical lineup and identified another African-American man as the shooter, not White. At the preliminary hearing, she identified White as the shooter but admitted that by that time she had seen his photograph in the newspaper at least five times. Mesday, the security guard, did not identify White at a photo lineup less than three weeks after the murder. The next day at a physical lineup, she identified White, saying "he looks a little like him, but I'm not sure." At trial, Mesday identified White as the man she saw in the parking garage. The identification by Bobby Lide, the third eyewitness, was similarly problematic. On the day after the murder, Lide failed at a photo lineup to identify White as the man he saw running from the parking garage. A couple of weeks later, he did identify White in a photo lineup and a physical lineup, after he had seen White's photo in the newspaper.
In Echavarria, this court concluded that "eyewitness identifications aside, the remaining evidence linking [the appellant] to the crime was clearly of a qualitative magnitude that renders harmless the error in excluding" the expert testimony on eyewitness identification. Id. The remaining evidence included the following. The appellant took the morning of the crime off from work and lied to police about his whereabouts. His fingerprints were found on license plates connected to the crime. Items linking him to the crime were found in his apartment and a dumpster outside his apartment. The sum of this evidence established beyond a reasonable doubt the appellant's guilt. Id.
In the instant case, no such evidence remains after setting aside the eyewitness identifications. Absent the identifications, White was not linked to the crime. Therefore, the district court's error in excluding expert testimony regarding such identification was not harmless under Echavarria, and the case should be remanded for a new trial.
The second issue is juror bias, regarding which the district court held a hearing. One juror testified that during deliberations other jurors compared White to:
a gorilla, a baboon, a native tribesman who is not dangerous to his own people but would club or murder anyone outside of his territory, an amoeba, an organism whose only ability is to reproduce, a predator, a non-human....
The district court appeared to believe the juror's testimony credible but found the statements were not racial. On appeal, White argues that the court erred and he did not have a fair and impartial jury. I agree.
The constitutional guarantee of a fair trial includes the right to "an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. Interpreting the Sixth Amendment, courts hold that the risk of racial prejudice in some circumstances requires questioning concerning such prejudice upon the defendant's request. See Rosales-Lopez v. United States, 451 U.S. 182, 188-89, 101 S.Ct. 1629, 1634-35, 68 L.Ed.2d 22 (1980). In these cases, courts have focused on whether a likelihood exists that jurors hold racial bias, rather than whether bias may have affected *296 the trial's outcome. See, e.g., Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 1688-89, 90 L.Ed.2d 27 (1986).
The use of blatantly racist speech by non-black jurors about a black defendant reflects those jurors' racist predispositions and denied White his Sixth Amendment right to an impartial jury. See Tobias v. Smith, 468 F.Supp. 1287, 1289 (W.D.N.Y.1979) (juror's introduction of racial issues into jury deliberation violated Sixth Amendment right to an impartial jury). Several of the jurors' expressions epitomize racist stereotypes of African Americans and evidence deep racial prejudice. For example, the "native tribesman" image evokes a degrading caricature of African Americans as backward and unworthy to be equal members of our society. The animal imagery dehumanizes African Americans and makes it easier to justify racial subordination. Sheri Lynn Johnson, Racial Imagery in Criminal Cases, 67 Tul.L.Rev. 1739, 1753-54 (1993) (discussing how racist stereotypes often portray African Americans as animals).
Racial prejudice distorts and fatally compromises "the impartiality of the jury as a fact-finder." Miller v. North Carolina, 583 F.2d 701, 708 (4th Cir.1978). "Racial prejudice... color[s] the jury's perception of every event at trial and render[s] unreliable its assessment of all evidence in the case." Developments in the LawRace and the Criminal Process, 101 Harv.L.Rev. 1472, 1595 (1988). Since racial prejudice distorts all the jury's observations and judgments, a court cannot isolate the prejudicial error to determine its effect on the jury. Accordingly, harmless error analysis is inappropriate. See Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). I would remand this case for a new trial.
The district court should have admitted Dr. Clark's testimony regarding factors that affect the reliability of eyewitness testimony. Furthermore, White was denied his Sixth Amendment right to an unbiased jury because the record clearly shows that some jurors were racially prejudiced. I agree with the majority that this was an unnecessary, atrocious crime and the perpetrator deserves, at the very least, the punishment assessed by the jury and the court. However, I want to be confident that the correct person was identified by the eyewitnesses as the perpetrator and that the jury's conclusion was not the product of racial prejudice. For the reasons stated, I do not have such confidence and therefore would prefer to reverse this conviction and remand this case to the district court for a new trial.
NOTES
[1] One juror reported to the court that during penalty deliberations one of the other jurors had "likened the defendant to a gorilla, a baboon, a native tribesman who is not dangerous to his own people but would club or murder anyone outside of his territory."
[1] The record does not reveal explicitly the racial identity of Vicki Davenport and Mesday, but it is evident that they are not black. The State argued that cross-racial testimony is irrelevant to the third eyewitness's testimony because he is an African American, but did not make this argument in regard to Vicki Davenport or Mesday.
[2] Generally, courts rely upon a Note published in Stanford Law Review. See Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan.L.Rev. 969 (1977) (Did Your Eyes Deceive You?). The district court explained that it relied on Did Your Eyes Deceive You? to reject Dr. Clark's testimony. Contrary to the district judge's ruling, however, Did Your Eyes Deceive You? concludes that "expert psychological testimony should be presented to aid the trier of fact in evaluating identification evidence, and ... that such testimony is not only admissible but necessary for a competent defense and serves as a valuable safeguard against conviction of the innocent." Id. at 971.