GERALD ARMOND GALLEGO, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 35291

May 17, 2001 23 P.3d 227

[Rehearing denied July 10, 2001]

*Steven G. McGuire,* State Public Defender, and *James P. Logan,* Chief Deputy Public Defender, Carson City, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Belinda Quilici,* District Attorney, *John J. Kadlic,* Deputy District Attorney, and *Brent T. Kolvet,* Special Deputy District Attorney, Pershing County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Appellant Gerald Armond Gallego murdered two teenage girls in Pershing County in 1980. He was convicted and sentenced to death. In 1997, a federal court ordered that Gallego be resentenced. He received a new penalty hearing and was again sentenced to death.

Gallego contends that a number of errors occurred at his second penalty hearing, including that the district court erred in not permitting him to represent himself and in not appointing substitute counsel. We conclude that none of Gallego's assignments of error warrant relief.

### FACTS

Two teenage girls, Stacey Redican and Karen Twiggs, disappeared from a shopping mall in Sacramento, California, in April 1980. Their bodies were found in July 1980 in shallow graves in remote Limerick Canyon, Nevada. The State's primary witness, Charlene Williams (aka Charlene Gallego), testified that she

enticed the two victims into a van where they were forcibly confined, sexually molested by Gallego, driven to Limerick Canyon, and then murdered by Gallego with a hammer. Evidence also showed that Gallego and Williams acted similarly in the earlier kidnapping and killing of two teenage girls in California, Kippi Vaught and Rhonda Scheffler. The jury found Gallego guilty of two counts each of first-degree murder and first-degree kidnapping. During the penalty phase, the State introduced evidence that Gallego had been convicted of murdering two more people in California, Mary-Beth Sowers and Craig Miller. He was sentenced to death for the murders in this case and received two consecutive sentences of life without the possibility of parole for the kidnappings. This court affirmed Gallego's conviction and sentence.[1]

In 1997, the Ninth Circuit Court of Appeals concluded that a jury instruction on the possibility of executive clemency had been misleading and ordered that Gallego be resentenced.[2]

The district court appointed the Nevada State Public Defender to represent Gallego. Gallego moved in proper person to be permitted to represent himself in October 1998. Steven McGuire, Gallego's lead counsel, filed a response to the motion asking the district court to determine as a threshold question whether Gallego was competent. In January 1999, the district court approved the employment by the defense of a psychiatrist and a psychologist to examine Gallego. An evidentiary hearing on Gallego's competency was held May 10-12, 1999. The district court found him competent.

Following this finding, McGuire filed a brief in support of Gallego's motion for self-representation. Gallego submitted a request in proper person for discharge of McGuire and substitution of counsel. At a hearing in August 1999, the district court denied Gallego's motions to represent himself and for substitute counsel.

The second penalty hearing was held in September 1999. The State presented evidence that Gallego kidnapped and murdered Redican and Twiggs, that he had been convicted of kidnapping and murdering two other people in California (Sowers and Miller), and that he kidnapped and killed two more people in California (Vaught and Scheffler) but had not been charged with the latter offenses.

The defense introduced written declarations by a number of people familiar with extreme physical and emotional abuse that

---

[1]*See Gallego v. State,* 101 Nev. 782, 784, 711 P.2d 856, 858 (1985) (reciting the facts); *Gallego v. McDaniel,* 124 F.3d 1065, 1068-69 (9th Cir. 1997) (*Gallego II*) (same).

[2]*Gallego II,* 124 F.3d at 1074-76, 1079.

Gallego suffered growing up and by Dr. Myla K. Young, the psychologist who examined him. Psychiatrist Dr. David V. Foster testified for the defense. Gallego's medical history showed that he had suffered serious head injuries, and Foster stated that neuropyschiatric and neuropsychological testing and a CAT (computerized axial tomography) scan indicated significant damage to Gallego's brain. Foster summed up Gallego's family history as follows: "Mr. Gallego was severely tortured, beaten, humiliated and at times starved and deprived of food, affection, warmth, and suffers severe post-traumatic stress disorder as a consequence."

The jury found all three alleged aggravating circumstances, which were that the murder was committed: by a person previously convicted of another murder; by a person previously convicted of a felony involving the use or threat of violence; and while the defendant was engaged in the commission of kidnapping in the first degree. It found that the mitigating circumstances did not outweigh the aggravating circumstances and returned a death sentence for each murder.

The defense filed a motion for a new trial, alleging that the jury neglected its duty to consider the mitigating evidence. After a hearing on the motion, the district court denied it. A sentencing hearing was then held, and the court entered judgment and sentenced Gallego to death.

## DISCUSSION

### I. *The denial of appellant's motion to represent himself*

Gallego contends that the district court violated his constitutional right to represent himself.

A criminal defendant has the right to self-representation under the Sixth Amendment of the United States Constitution and article 1, section 8 of the Nevada Constitution.[3] However, an accused who chooses self-representation must satisfy the court that his waiver of the right to counsel is knowing and voluntary.[4] Such a choice can be competent and intelligent even though the accused lacks the skill and experience of a lawyer, but the record should establish that the accused was made aware of the dangers and disadvantages of self-representation.[5] Deprivation of the right to self-representation is reversible, never harmless, error.[6] A court may

---

[3]U.S. Const. amend. VI; *Faretta v. California,* 422 U.S. 806, 818-19 (1975); Nev. Const. art. 1, § 8, cl. 1.

[4]*Faretta,* 422 U.S. at 835; *Godinez v. Moran,* 509 U.S. 389, 400-01 (1993).

[5]*Faretta,* 422 U.S. at 835.

[6]*McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984).

deny a defendant's request for self-representation when the defendant is incompetent to waive the right to counsel, the request is untimely, the request is equivocal, the request is made solely for the purpose of delay, or the defendant abuses the right to self-representation by disrupting the judicial process.[7]

The district court expressed a number of grounds for denying Gallego's motion to represent himself. It found the request to be untimely and equivocal and that Gallego had waived the right to represent himself. It also cited Gallego's uncooperative, obstructive behavior as grounds to deny the motion.

*Whether the request for self-representation was untimely or waived*

In *Lyons v. State,* this court held that if a request for self-representation "comes early enough to allow the defendant to prepare for trial without need for a continuance, the request should be deemed timely."[8] We conclude that the district court erred in deeming Gallego's request untimely. None of the cases cited by the court on this issue were apposite since all involved requests for self-representation coming on the first day of trial or later.[9]

Here, the district court treated Gallego's request to represent himself as if it came just before the penalty phase in the midst of an ordinary, uninterrupted capital trial. This treatment was not appropriate because the penalty phase followed the original trial by fifteen years and required a new jury to be empaneled. Gallego first made his request in October 1998, almost a year before that empaneling. There is no indication that Gallego was trying to delay the proceedings. Deeming the request untimely under these circumstances improperly placed form over substance and was erroneous. Under *Lyons,* Gallego's request was timely because it was made well before the penalty phase of the trial and did not necessitate a continuance.

The district court also found that Gallego waived the right to represent himself by accepting court-appointed counsel at his original trial. It cited our opinion in *Tucker v. State,* which holds: "Where a defendant requests a court-appointed attorney and thereafter voluntarily acquiesces in representation by that court-appointed attorney, he waives his constitutional right to conduct a

---

[7]*Tanksley v. State,* 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997).

[8]106 Nev. 438, 446, 796 P.2d 210, 214 (1990).

[9]*See, e.g., United States v. Lawrence,* 605 F.2d 1321, 1325 (4th Cir. 1979) (holding that request made on second day of trial was properly refused as "a ploy to frustrate the orderly procedures of a court").

*pro se* defense."[10] In *Tucker,* a burglary defendant told the district court at a pretrial hearing he would not accept representation by the public defender, but then voluntarily accepted such representation and made no objection once it commenced.[11]

*Tucker* is not on point here, and again the district court placed form over substance and treated Gallego's request as if it came in the midst of an ongoing trial. It concluded that his acceptance of appointed counsel for the trial in 1984 acted to waive his right to proceed without counsel at the second penalty hearing fifteen years later. However, during the proceedings related to the new penalty hearing Gallego never acquiesced to the appointment of his counsel, and the court erred in finding waiver under these circumstances.

> *Whether appellant's request for self-representation was equivocal*

The district court found Gallego's request to be equivocal because Gallego also asked the court for substitution of counsel. The pertinent facts are the following.

In September 1998, the district court appointed the Nevada State Public Defender to represent Gallego. Gallego filed a motion for permission to represent himself on October 8, 1998. This motion unequivocally asked the court to allow Gallego to represent himself. When Gallego first appeared before the district court on October 16, 1998, he informed the court, "I am my attorney."

Gallego's counsel, McGuire, then asked for a determination of Gallego's competency, and for most of a year the proceedings in district court largely related to this issue. During a competency hearing in November 1998, Gallego told the court that his appointed attorneys were trying to kill him and he wanted another lawyer. The court asked, "Are you saying you don't want to represent yourself?" Gallego said, "I want another lawyer, one I can talk to, a real lawyer like [the State] got." The court said, "it appears for the record that you want an attorney, you just don't want the attorneys you have right now; is that correct, sir?" Gallego said, "I want an attorney that is going to represent me. It's just that simple."

In July 1999, the district court found that Gallego was competent. In August 1999, McGuire filed a brief supporting Gallego's motion for self-representation. McGuire asserted that if a canvass under *Faretta* showed that Gallego had made his decision with a clear comprehension of the attendant risks, then he had the right

---

[10]92 Nev. 486, 491, 553 P.2d 951, 954 (1976).

[11]*Id.*

to waive counsel and represent himself. Around the same time, Gallego submitted a *pro per* request for discharge of McGuire and substitution of counsel.

At a hearing on August 24, 1999, as the district court began to canvass Gallego on his request to represent himself, he asked the court to first address his motion for substitute counsel. The court agreed to do so. Gallego said that McGuire had a conflict of interest and there was a lack of trust and total breakdown of communications. He therefore asked the court "to terminate Mr. McGuire and appoint new counsel." Gallego insisted that the motion for substitute counsel was not connected to his motion to represent himself. He said, "I don't know how the court is going to rule on my motion to represent myself, but either way I would object to Mr. McGuire." Gallego acknowledged that because he was indigent he was not entitled to counsel of his choice, but he asked the court for any counsel other than McGuire or anyone from his office. McGuire agreed that there had been an irremediable breakdown in the attorney-client relationship and joined in Gallego's motion.

Without addressing the motion for self-representation or conducting a *Faretta* canvass, the court denied Gallego's motion to represent himself, finding it equivocal. We conclude that the record does not support this finding.

During the August 1999 hearing, the district court, Gallego, McGuire, and the prosecutor all to some degree obscured the discussion of the motion for substitute counsel with references to the motion for self-representation. It was reasonable, however, for Gallego to ask the court to first decide the motion for substitution of new counsel because granting it would have rendered the motion for self-representation moot. And although Gallego stated more than once that his motion for substitute counsel was a separate request, the court never distinguished it from the motion for self-representation. Thus, the court saw the request for new counsel as nothing more than an equivocal element in the motion for self-representation. However, this "equivocation" might have been eliminated if the court had addressed the motions separately.

There is no question that Gallego sought to have new counsel appointed. Though relevant to a request for self-representation, this is not dispositive. Numerous courts have recognized that a request to proceed without counsel can be unequivocal even if in the alternative the defendant would prefer a different attorney.[12]

---

[12]*See, e.g., Hamilton v. Groose,* 28 F.3d 859, 862 (8th Cir. 1994) (concluding the request was equivocal); *Adams v. Carroll,* 875 F.2d 1441, 1444-45 (9th Cir. 1989) (concluding the request was unequivocal); *State v. Stenson,* 940 P.2d 1239, 1275-76 (Wash. 1997) (equivocal); *State v. Sinclair,* 730 P.2d

The Ninth Circuit's analysis in *Adams v. Carroll* is apt.

> Although [Adams's] two self-representation requests were sandwiched around a request for counsel, this was not evidence of vacillation. To the contrary, each of these requests stemmed from one consistent position: Adams first requested to represent himself when his relationship with Carroll broke down. He later requested counsel, but with the express qualification that he did not want Carroll. When Carroll was reappointed, Adams again asked to represent himself. Throughout the period before trial, Adams repeatedly indicated his desire to represent himself if the only alternative was the appointment of Carroll. While his requests no doubt were *conditional,* they were not equivocal.[13]

Here, it appears that Gallego's requests to represent himself and for substitute counsel also stemmed from one consistent position: his desire to discharge McGuire as his counsel.

Although an unequivocal request for self-representation can be conditional, "it must speak to self-representation and not simply to a dissatisfaction with current counsel," and "a court can insist that the defendant explicitly cho[o]se to proceed pro se once informed that a substitution of counsel will not be permitted."[14] Gallego's request went beyond dissatisfaction with counsel and expressly sought self-representation, but he was never presented the explicit choice to proceed in proper person.

The question is whether Gallego wanted to represent himself if he could not have new counsel. We do not have a definitive answer to this because no record was made on the issue. The district court's conclusion that Gallego's request was equivocal was, at best, premature. The court should have denied the request for substitute counsel and then ascertained whether Gallego nevertheless wanted to represent himself. The record as it stands suggests that Gallego would have preferred to represent himself rather than be represented by McGuire and the State Public Defender. Therefore, the district court erred in finding the request equivocal simply because Gallego preferred to have new counsel.

*Whether appellant was disruptive*

The United States Supreme Court has stated: "The right of

---

742, 745 (Wash. Ct. App. 1986) (unequivocal); *People v. Longuemire,* 257 N.W.2d 273, 274-75 (Mich. Ct. App. 1977) (unequivocal).

[13]*Adams,* 875 F.2d at 1444-45.

[14]3 Wayne R. LaFave et al., *Criminal Procedure* § 11.5(b), at 573, and (d), at 582 (2d ed. 1999).

self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law."[15] An accused has the right to conduct his own defense provided that he is "able and willing to abide by rules of procedure and courtroom protocol."[16]

A defendant's pretrial activity is relevant in determining whether the defendant will disrupt courtroom proceedings.[17] This court will not substitute its evaluation for the district court's personal observations and impressions if the latter finds that a defendant will be disruptive.[18] We conclude that the record supports a finding that Gallego's pretrial behavior showed he was unable or unwilling to abide by rules of procedure and courtroom protocol.

Although the district court was concerned with Gallego's refusal to cooperate with the mental health experts appointed to determine his competency, we do not consider this behavior relevant to his right to conduct his own defense because a defendant has the Fifth Amendment right to remain silent during a court-ordered psychiatric interview.[19] Other behavior by Gallego, however, was relevant to his right to represent himself. He showed an unwillingness or inability to follow procedural rules in repeatedly claiming his innocence and seeking to present evidence on that issue despite being informed by the district court that such a claim was improper during the penalty phase. Gallego impeded pretrial proceedings on numerous occasions by refusing to respond or participate, often claiming that he could not hear the district court or another speaker. Although the record shows that there was some trouble with acoustics in the courtroom as well as with Gallego's hearing, it also establishes that Gallego was frequently malingering. Although the prison provided Gallego with a hearing aid, he did not wear it and denied having received one. The district court was remarkably patient, but noted that Gallego's hearing problem appeared to come and go. During proceedings Gallego often waited long periods of time before asserting that he had not been able to hear anything the court had said. Several times he simply refused to respond at all to the court. At least twice he turned his back on courtroom proceedings and once refused to participate in a hearing conducted by conference call.

[15]*Faretta,* 422 U.S. at 835 n.46.

[16]*McKaskle,* 465 U.S. at 173.

[17]*Tanksley,* 113 Nev. at 1001, 946 P.2d at 150.

[18]*Id.* at 1002, 946 P.2d at 151.

[19]*See* U.S. Const. amend. V; *Brown v. State,* 113 Nev. 275, 288-89, 934 P.2d 235, 244 (1997).

It is clear from the overall record that Gallego repeatedly and intentionally obstructed the proceedings below. We conclude that the district court acted within its discretion in denying his motion for self-representation based on this behavior.

II. *The denial of appellant's motion for substitute counsel*

Gallego contends that the district court erred in denying his motion to substitute new counsel. The pertinent facts follow.

On August 13, 1999, Gallego submitted a *pro per* motion for discharge of McGuire and substitution of counsel. Gallego alleged a "conflict of interest" because "all his [McGuire's] defen[s]e does is offer me up to the D.A. for ex[e]cution" and McGuire had "not filed any motions I feel he should have." Gallego also alleged a total breakdown of communications and lack of trust because McGuire had lied to him and failed to keep promises.

At the hearing on August 24, 1999, Gallego argued in support of his motion for substitute counsel. He complained that he was not receiving records of the court proceedings and claimed that McGuire had broken his promise to bring in attorney Richard Cornell to help with the defense. He explained he was asking the court for any counsel other than McGuire or anyone from his office, not for a particular attorney. Gallego also maintained that he had new evidence proving his innocence which he wished to present to the court. During the hearing McGuire moved to withdraw. He explained that he had felt compelled to raise the issue of Gallego's competency early in the proceedings against Gallego's wishes and this had harmed their relationship. McGuire agreed that there had been "an irremediable breakdown for any potential attorney-client relationship." McGuire also believed that he had sent Gallego all the records in the case. The court rejected Gallego's motion for substitute counsel.

In *Thomas v. State,* this court held that a defendant's right to substitution of counsel is limited:

"A defendant is not entitled to reject his court-appointed counsel and request substitution of other counsel at public expense absent a showing of adequate cause for such a change." *Junior v. State,* 91 Nev. 439, 441, 537 P.2d 1204 (1975). The decision whether friction between counsel and client justifies appointment of new counsel is entrusted to the sound discretion of the trial court and should not be disturbed on appeal in the absence of a clear showing of abuse.[20]

---

[20]94 Nev. 605, 607-08, 584 P.2d 674, 676 (1978) (citation omitted).

Where a motion for new counsel is made considerably in advance of trial, the court may not summarily deny the motion but must adequately inquire into the defendant's grounds for it.[21] " 'A defendant cannot base a claim of inadequate representation upon his refusal to cooperate with appointed counsel. Such a doctrine would lead to absurd results.' "[22]

*Thomas* is consistent with other case law on this topic. An indigent defendant "has a right to substitution only upon establishing 'good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which [could] lead . . . to an apparently unjust verdict.' The mere loss of confidence in his appointed counsel does not establish 'good cause.' "[23] Good cause is not "determined solely according to the subjective standard of what the defendant perceives. While loss of trust is certainly a factor in assessing good cause, a defendant seeking substitution of assigned counsel must nevertheless afford the court with legitimate reasons for the lack of confidence."[24] "Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense."[25]

Here, Gallego undoubtedly lacked confidence and trust in his counsel and often refused to work with them. (It was not an absolute breakdown in the relationship, however. Gallego was able to meet and consult with counsel during the penalty phase although he still disagreed with them.) But Gallego never provided legitimate reasons for his lack of confidence in his counsel. Although he claimed that McGuire had a "conflict of interest," he provided no evidence that McGuire's loyalty was in any way compromised. Gallego apparently based this claim on his contention that McGuire's defense would offer him up for execution. This amounted to a disagreement between Gallego and McGuire over trial strategy, not a conflict of interest. This disagreement was not good cause for substitution of counsel: McGuire's strategy was reasonable while Gallego's strategy was ill-conceived and largely impermissible.

Gallego wanted to dispute his culpability and blame Charlene Williams for the murders and even call her as a witness. He wanted to present evidence that she was a violent, intimidating

[21]*See id.* at 608, 584 P.2d at 676.

[22]*Id.* (quoting *Shaw v. United States,* 403 F.2d 528, 529 (8th Cir. 1968)).

[23]3 LaFave, *Criminal Procedure* § 11.4(b), at 555 (quoting *McKee v. Harris,* 649 F.2d 927, 931 (2d Cir. 1981)) (footnotes omitted).

[24]*McKee,* 649 F.2d at 932.

[25]*Stenson,* 940 P.2d at 1272.

lesbian who had sex by force; that she was a liar; and that she had made a plea agreement and was no longer serving prison time for her crimes. Further, Gallego wanted to present evidence that the original trial prosecutor and others had written and profited from a book on Gallego's crimes. He also wanted to present a statement from his deceased mother and testimony by his brother, his cousin, and a former employer as mitigating evidence.

McGuire's strategy was to present evidence that Gallego had endured severe physical and emotional abuse as a child—including at the hands of his mother—and that he suffered from mental disabilities and had abused drugs. McGuire also informed the jury that Williams actively participated in the crimes, lied to authorities various times, and received a plea bargain and was now free, but he did not call Williams because he considered her a hostile witness who would have provided damaging testimony against Gallego. McGuire expressed doubt that the jury would find it relevant that people connected to Gallego's case had written a book about it. And McGuire had attempted to locate various mitigation witnesses, but many could not be found, and others did not want to testify.

We conclude that McGuire's strategy was reasonable, while much of the evidence which Gallego wished to present was not even admissible. A court may exclude proffered mitigating evidence as irrelevant if it does not bear on the defendant's character, his prior record, or the circumstances of his offense.[26] Evidence presented in mitigation must be relevant to the offense, the defendant, or the victim.[27]

Gallego's claim that McGuire broke a promise to have attorney Richard Cornell join the defense team is somewhat understandable, but groundless. In November 1998, McGuire applied for the district court's approval to employ Cornell to assist in the case because the federal court's deadline for resentencing was so short and Cornell had represented Gallego for eleven years. The court originally ordered the employment. However, McGuire did not oppose the State's request to rescind the order after the federal court granted a six-month extension of time for the resentencing. Gallego has offered no other specific basis for his claims that McGuire lied to him and broke promises made to him. Nor has he specified any motions which McGuire refused to file.

We conclude that the district court adequately inquired into Gallego's grounds for moving to substitute counsel, that Gallego

[26]*See Harte v. State,* 116 Nev. 1054, 1069, 13 P.3d 420, 430 (2000) (citing *Lockett v. Ohio,* 438 U.S. 586, 604 n.12 (1978)).

[27]NRS 175.552(3); *Collman v. State,* 116 Nev. 687, 725, 7 P.3d 426, 450 (2000).

proffered no legitimate reason for his lack of confidence and trust in his counsel, that his counsel represented him ably, and that the attorney-client conflict here did not prevent the presentation of an adequate defense or result in an apparently unjust verdict. Therefore, the court acted within its sound discretion in refusing to appoint substitute counsel.

### III. The propriety of jury instructions and closing argument

Gallego contends that certain jury instructions were erroneous and that the prosecutor made improper remarks during closing argument. Gallego did not object below to the instructions or remarks. Failure to object during trial generally precludes appellate consideration of an issue.[28] Despite such failure, this court has the discretion to address an error if it was plain and affected the defendant's substantial rights.[29] Normally, the defendant must show that an error was prejudicial in order to establish that it affected substantial rights.[30]

Gallego complains that instruction numbers 10 and 29 and a remark by the prosecutor failed to inform jurors that they had to weigh any mitigating circumstances against aggravating circumstances before considering other evidence offered by the State against Gallego. No error occurred: the jury instructions and the prosecutor's remarks as a whole correctly informed the jury to consider the mitigating evidence.[31] Gallego also claims that instruction number 9 was erroneous under *Geary v. State*.[32] This claim has no merit.

Gallego complains that the prosecutor commented in closing argument that the defense had not rebutted the alleged aggravators. This comment was improper. To obtain a death sentence, the State must prove beyond a reasonable doubt that at least one aggravating circumstance exists and that the aggravating circum-

---

[28]*Rippo v. State,* 113 Nev. 1239, 1259, 946 P.2d 1017, 1030 (1997).

[29]*See* NRS 178.602 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

[30]*See United States v. Olano,* 507 U.S. 725, 734-35 (1993) (discussing Fed. R. Crim. P. 52(b), which is identical to NRS 178.602).

[31]*See Greene v. State,* 113 Nev. 157, 167-68, 931 P.2d 54, 61 (1997) (a jury instruction is not judged in isolation, but must be viewed in the context of the overall charge), *receded from on other grounds by Byford v. State,* 116 Nev. 215, 994 P.2d 700 (2000).

[32]114 Nev. 100, 103-04, 952 P.2d 431, 432-33 (1998).

stance or circumstances outweigh any mitigating evidence.[33] Thus, the prosecutor's remark improperly suggested that the defense had a burden to disprove aggravating circumstances.[34] Nevertheless, the remark here was extremely brief and general, and there was overwhelming evidence to prove the three aggravating circumstances. Even assuming the error was plain, we conclude that the remark did not affect Gallego's substantial rights.

## IV. *The jury's failure to fully mark a special verdict form*

The jury received a special verdict form directing it to check any listed mitigating circumstances that it found or to check that it found none. The form then directed the jury to check that either the mitigating circumstances were sufficient to outweigh the aggravating circumstances or were not. The jury checked only the final item on the verdict form: the mitigating circumstances were not sufficient to outweigh the aggravating circumstances.

Gallego contends that the failure to fill out the whole verdict form shows that the jury failed to consider the mitigating evidence and weigh it against the aggravating circumstances. He also claims that he proved, without rebuttal, the eleven mitigators listed on the form.

As an initial point, there is no requirement that a jury specify the mitigating circumstances it has found.[35] NRS 175.554(3) provides that the jury need only state that there are no mitigating circumstances which outweigh the aggravating.[36] The jury here so stated.

We do not accept Gallego's suggestion that jurors had to find some or all of his proffered mitigating circumstances simply because he presented unrebutted evidence to support them. Although the State did not offer any direct rebuttal evidence, the prosecutor cross-examined the defense psychiatrist vigorously and argued generally against the mitigating force of Gallego's evidence. Jurors were properly instructed to consider the evidence presented in mitigation. We presume that the jurors followed their instructions and considered the evidence.[37] Gallego "fails to cite

[33]*See Witter v. State,* 112 Nev. 908, 923, 921 P.2d 886, 896 (1996), *receded from on other grounds by Byford,* 116 Nev. 215, 994 P.2d 700.

[34]*See, e.g., Whitney v. State,* 112 Nev. 499, 502, 915 P.2d 881, 883 (1996) ("[I]t is generally improper for a prosecutor to comment on the defense's failure to produce evidence or call witnesses as such comment impermissibly shifts the burden of proof to the defense.").

[35]*See Rogers v. State,* 101 Nev. 457, 469, 705 P.2d 664, 672 (1985).

[36]*Id.*

[37]*See Thomas v. State,* 114 Nev. 1127, 1149, 967 P.2d 1111, 1125 (1998).

any authority which holds that a jury is required to find a mitigating circumstance when a defendant presents evidence in support of that circumstance."[38] It appears that the jurors found no mitigating circumstances and simply overlooked that they were supposed to indicate this on the form. We conclude that no error occurred here.

Given the jury's failure to fill out the entire verdict form, Gallego also claims that this court cannot perform its mandatory review of his death sentence because we must review the weight that jurors gave to the mitigating evidence. We disagree. NRS 177.055(2) requires this court to consider, among other things, whether a death sentence is excessive. To do so, we must consider the mitigating evidence presented by a capital defendant, but our review is not dependent on the jury's assessment of that evidence. In fact, as discussed above, this court may not even know the jurors' findings on particular alleged mitigators because a verdict form specifying such findings is not required. Therefore, the jury's failure to fully mark its verdict form does not prevent our mandatory review of Gallego's sentence.

## V. Appellant's exclusion from in camera proceedings

Gallego complains that he was not present at a number of in camera proceedings. Specifically, he contends that his right to be present at the empaneling of the jury was violated because several prospective jurors were excused in such proceedings. We conclude that no error occurred.

Gallego cites two decisions by the United States Supreme Court for authority that his right to be present was violated, but these cases are distinguishable because they both involved the defendants' absence when challenges to prospective jurors were being made and decided.[39] Here, by contrast, the prospective jurors were dismissed by the stipulation of both counsel for reasons ranging from knowledge of the case to ill health.

This court has explained that a defendant does not have an unlimited right to be present at every proceeding.

> The right to be present is rooted in the Confrontation Clause and the Due Process Clause of the Federal Constitution. The confrontation aspect arises when the pro-

---

[38]*Id.*

[39]*Lewis v. United States,* 146 U.S. 370, 376 (1892); *Hopt v. Utah,* 110 U.S. 574, 577 (1884).

ceeding involves the presentation of evidence. The due process aspect has been recognized only to the extent that a fair and just hearing would be thwarted by the defendant's absence. The right to be present is subject to harmless error analysis. The defendant must show that he was prejudiced by the absence.[40]

No evidence presented at the in camera proceedings implicated Gallego's confrontation right. He has not shown how his absence prejudiced him in any way, and we conclude that the proceedings were fair and just despite his absence.

## VI. *Appellant's waiver of his right to testify*

Gallego claims that the waiver of his right to testify was not valid because he made it under a misconception that his testimony would have been restricted. This claim has no merit.

The district court advised Gallego fully of his right to testify or to speak in allocution, explaining that any statements he gave would be limited to matters relevant to the penalty phase, such as mitigating circumstances and expressions of remorse, not issues of guilt. Gallego responded that if he could not tell ''the whole truth,'' he had ''no choice but to forfeit'' his right to testify. Gallego did speak in allocution.

''Criminal defendants have the right to testify on their own behalf under the due process clause of the fourteenth amendment, the compulsory process clause of the sixth amendment and the fifth amendment's privilege against self-incrimination.''[41] The United States Supreme Court has stated that a valid waiver of a fundamental constitutional right ordinarily requires ''an intentional relinquishment or abandonment of a known right or privilege.''[42] Courts should indulge every reasonable presumption against waiver and should not presume acquiescence in the loss of fundamental rights.[43]

Gallego contends that his waiver of his right to testify was not knowing because at trial he believed that his testimony would be restricted when he actually could have testified ''as he wished,''

---

[40]*Kirksey v. State,* 112 Nev. 980, 1000, 923 P.2d 1102, 1115 (1996) (citations omitted).

[41]*Phillips v. State,* 105 Nev. 631, 632, 782 P.2d 381, 382 (1989) (citing *Rock v. Arkansas,* 483 U.S. 44, 49 (1987)).

[42]*Johnson v. Zerbst,* 304 U.S. 458, 464 (1938).

[43]*Barker v. Wingo,* 407 U.S. 514, 525-26 (1972).

subject to cross-examination. He is incorrect. "The proper place for the introduction of evidence tending to establish innocence is in the guilt phase of trial. At the penalty phase, the defendant's guilt has already been assessed and is no longer in issue."[44] Evidence presented in mitigation must be relevant to the offense, the defendant, or the victim.[45] At a capital penalty hearing, a court may constitutionally exclude evidence as irrelevant if it does not bear on the defendant's character, his prior record, or the circumstances of his offense.[46]

Thus, Gallego's belief at trial that the scope of his testimony could be limited was not a misconception. We conclude that Gallego understood his right to testify and intentionally waived it.

## VII. *Other assignments of error*

Gallego's other assignments of error also warrant no relief.

Gallego claims that Nevada's capital sentencing scheme improperly allows a jury to find a defendant death-eligible based on evidence other than enumerated aggravating circumstances and therefore the district court erred in denying his motion to trifurcate or bifurcate the penalty hearing. We conclude that the process by which juries in capital cases in Nevada consider the evidence and decide on a sentence is constitutionally adequate.[47]

Gallego complains that a former sheriff's lieutenant said without any supporting evidence that Gallego and Williams were "responsible for probably ten murders." Testimony regarding police investigations of a defendant's other crimes is admissible at a capital penalty hearing so long as the evidence is not impalpable or highly suspect.[48] The remark here constituted only impalpable evidence; however, the remark was inadvertent and brief. Reliable evidence did establish that Gallego had committed six murders: the two in this case, the two he was convicted of in California, and two uncharged murders in California. In light of this evidence, we conclude that the single, passing reference to four other possible murders did not prejudice Gallego.

Gallego contends that he was denied funding for magnetic resonance imaging and positron emission tomography testing neces-

---

[44]*Echavarria v. State,* 108 Nev. 734, 744, 839 P.2d 589, 596 (1992).

[45]NRS 175.552(3); *Collman,* 116 Nev. at 725, 7 P.3d at 450.

[46]*See Harte,* 116 Nev. at 1069, 13 P.3d at 430.

[47]*See Hollaway v. State,* 116 Nev. 732, 745-47, 6 P.3d 987, 996-97 (2000); *Middleton v. State,* 114 Nev. 1089, 1116-17, 968 P.2d 296, 314-15 (1998).

[48]*Leonard v. State,* 114 Nev. 1196, 1214, 969 P.2d 288, 299 (1998).

sary to establish that he suffered from organic brain damage. We conclude that the district court did not err in denying the motion for the funding. Not only was Gallego appointed a psychiatrist and a psychologist who provided their opinions that he had organic brain damage, but the record shows that he had received a CAT scan which his experts were able to rely on to support their opinions. Gallego has failed to show why further testing was necessary to adequately present this theory of mitigation.[49]

Gallego claims that the father of one of the victims asked the jury to return a death sentence. Gallego did not object below. A victim can express an opinion regarding the defendant's sentence only in noncapital cases.[50] However, no error, let alone plain error, occurred: Mr. Redican did not express to the jury an opinion regarding Gallego's sentence.

Gallego challenges the constitutionality of the death penalty in Nevada on several grounds. First, he claims that the aggravators set forth in NRS 200.033 fail to truly narrow the class of persons eligible for the death penalty. Gallego does not argue that any aggravator was misapplied in his case, and we reject this claim. Second, Gallego contends that NRS 175.552(3), which allows the introduction of evidence against a defendant on "any other matter which the court deems relevant," is unconstitutionally vague and is contrary to NRS 200.033. This contention lacks merit: the statutes are compatible, and we have defined the limited scope and use of "other matter" evidence.[51] Third, Gallego argues that the death penalty is cruel and unusual punishment in violation of the Eighth Amendment. Even if death is not an unusual punishment in this country, he contends that it is undeniably cruel and therefore violates article 1, section 6 of the Nevada Constitution, which prohibits "cruel or unusual punishments." We decline to reconsider our precedent upholding the constitutionality of the death penalty.

Finally, Gallego claims that the State improperly conducted his psychological evaluation at the Northern Nevada Correctional

---

[49]*See* NRS 7.135 (providing for reimbursement for "such investigative, expert or other services as may be necessary for an adequate defense"); *cf. Sonner v. State,* 112 Nev. 1328, 1340, 930 P.2d 707, 715 (1996) (a defendant is entitled to attempt to prove defense theory, but unlimited expenditure in effort to find support for theory is not required), *modified on other grounds on rehearing by* 114 Nev. 321, 955 P.2d 673 (1998).

[50]*Rippo,* 113 Nev. at 1261, 946 P.2d at 1031.

[51]*See, e.g., Hollaway,* 116 Nev. at 745-47, 6 P.3d at 996-97.

Center rather than at Lakes Crossing. We conclude that Gallego fails to demonstrate a violation of any right in this regard.

### VIII. *Mandatory review of appellant's death sentence*

Pursuant to NRS 177.055(2), we conclude that the evidence supports the aggravating circumstances found in this case; we discern no indication that Gallego's death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; and considering the crime and the defendant, we conclude that the sentence is not excessive.

### CONCLUSION

We conclude that the district court did not err in denying Gallego's motion to represent himself or his motion for substitute counsel. We also conclude that Gallego's other assignments of error do not warrant relief. We therefore affirm his judgment of conviction and sentence of death.[52]

AGOSTI, ROSE, LEAVITT and BECKER, JJ., concur.

---

[52]THE HONORABLE A. WILLIAM MAUPIN, Chief Justice, and THE HONORABLE CLIFF YOUNG, Justice, did not participate in the decision of this appeal.