An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

# IN THE SUPREME COURT OF THE STATE OF NEVADA

MAX REED, II,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 62177

**FILED**

JUL 3 0 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

## ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction entered pursuant to a jury verdict of first-degree murder with the use of a deadly weapon. Second Judicial District Court, Washoe County; Janet J. Berry, Judge.

*Sufficiency of the evidence*

Appellant Max Reed, II, claims that there was insufficient evidence to support his conviction. He argues that the descriptions the eyewitnesses gave of the suspects did not match his physical appearance, there was no direct evidence of his involvement in the victim's murder, and the circumstantial evidence gave equal or nearly equal support to the State's theory of guilt and his theory of innocence.

We review the evidence in the light most favorable to the prosecution and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). "[I]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses." *Nolan v. State*, 122 Nev. 363, 377, 132 P.3d 564,

14-24825

573 (2006) (internal quotation marks omitted). "Circumstantial evidence alone can certainly sustain a criminal conviction. However, to be sufficient, all the circumstances taken together must exclude to a moral certainty every hypothesis but the single one of guilt." *Buchanan v. State*, 119 Nev. 201, 217, 69 P.3d 694, 705 (2003) (footnote omitted).

The jury heard testimony that Reed, Deyundrea Holmes, and Jaffar Richardson conspired to rob Kristopher Mo Nelson, a drug dealer who was known to carry a large amount of cash. Their plan was to lure Nelson to his recording studio with a telephone call and then rob him as he left the studio. They executed their plan on the evening of November 4, 2003.

When Nelson and Kenneth Clark exited the recording studio they were confronted by two armed men. The men were dressed in black and their faces were concealed by ski masks. They separated Nelson from Clark. The man controlling Nelson carried a long-barreled, stainless-steel revolver. He battered Nelson with the revolver and demanded Nelson's money. When Nelson failed to produce the money, the man pulled off his ski mask, announced that he was going to shoot Nelson, and then shot Nelson.

Several people saw men near the crime scene and provided descriptions of these men to the police. Jennifer Windle saw two men loitering by a vacant apartment near Nelson's recording studio when she returned home from work at about 8:30 pm. She believed that they were wearing jackets and beanies, they were average-sized black males, and one had lighter colored skin than the other. She led the police to the spot where the men had been standing and the police discovered a freshly discarded cigarette butt.

Randy Pethtel was walking his dog at about 10:30 pm when he heard yelling and a gunshot, observed two men running, and saw that one of them was carrying a silver handgun with a six- to eight-inch barrel. He noticed that they were dressed in black, they were wearing hoodies and puffy-type jackets, and one of the jackets had white lettering on the back. Although he did not get a good look at their faces, he believed that they were Hispanic 15- or 16-year-olds. He also testified that one of them could have weighed as much as 200 pounds.

Lisa Schell happened to be looking outside her daughter's window at about 10:30 pm when she saw two men running. She noticed that they were wearing dark clothing and ski masks and that one of them carried a gun. She described them as appearing slender, being less than six feet tall, and weighing less than 200 pounds.

Jenny Morse heard a loud bang and looked out the living room window. She saw a man covered with blood stumble and fall and another man, who appeared to be scared and nervous, talking on a telephone. When the man with the telephone got into a vehicle and drove away, she called the police and provided the vehicle's license plate number.

The license plate number led the police to Kenneth Clark. The police determined that Clark was a victim and not a suspect. Clark was able to get a good look at the man controlling Nelson, but he was unable to see much of the man controlling him. Clark described his controller as a light-skinned black man with Asian-looking eyes and a wide nose. The man stood about five-foot-eight and weighed between 160 and 170 pounds.

The police were unable to identify the suspects from the eyewitness accounts, but their investigation suggested that Reed, Richardson, and someone named Kali were involved in murder. There

was no additional information for several years and the case went cold until Holmes was convicted of a felony. Holmes' DNA profile was entered into CODIS and was matched to the DNA sample taken from the discarded cigarette butt found at the crime scene. After the police determined that Holmes was known by the moniker "Kali," that Holmes and Reed had grown up together, and that Holmes was the man that Clark saw at the crime scene, their investigation gained momentum and the case against Reed, Holmes, and Richardson came together.

Richardson pleaded guilty to conspiracy to commit robbery and testified at Reed's preliminary hearing. He identified Reed in the justice court, disclosed that they planned the Nelson robbery in advance, and admitted to luring Nelson to the studio where Reed and Holmes lay in wait. His preliminary hearing testimony was read into evidence for the jury to hear.

Reed's girlfriend, Loren Torres, testified that Reed left the apartment on the night of the murder dressed in black and carrying a silver handgun with a "spinny" thing. She said that Reed had a black puffy coat with "Adidas" written on it and that the revolver and a bag of Holmes' clothes were thrown out after the murder. She acknowledged on cross-examination that she had told Reed that he "was heavy set, like 250, 260."

Joshua Fort testified that he knew Reed, Holmes, Richardson, and Nelson. He said that Reed asked him about Nelson's money and drugs and whether it would be okay to rob Nelson. He had visited Reed's apartment several times and had seen Holmes' duffle bag or backpack and a large, silver-colored revolver. He said that on November 4, 2003,

Richardson called and asked if he would give Reed and Holmes a ride. He described Reed as stocky and pushing 200 pounds.

Fort's sister, Tinisa Williams, testified that she had often seen Reed, Holmes, and Richardson. On November 4, 2003, her brother asked her to give Reed and Holmes a ride. She left her brother's house at around 9:00 pm, she parked the car where Reed and Holmes directed, and she waited for them after they left the car. When Reed and Holmes returned, they were "in duress," they told her to go several times, and she heard Reed call someone and say that "[t]hings went bad." She described Reed as being five-foot-ten or five-foot-eleven, on the thick side, and weighing about 180 or 190 pounds.

Detective Ronald Chalmers testified that the police department's in-house database indicated that Reed was five-foot-eight and weighed 185 pounds in December 2003 and that he weighed 205 pounds in August 2010. He further testified that it is very common for witnesses' accounts of a suspect's height and weight to vary, even when the witnesses have observed the same suspect at the same time.

We conclude from this testimony that a rational juror could reasonably find that all the circumstances taken together exclude any theory of innocence and demonstrate beyond a reasonable doubt that Reed participated in Nelson's death and is guilty of first-degree murder under the felony-murder rule. *See* NRS 200.030(1)(b).

*Motion for a new trial*

Reed claims that the district court should have treated his motion for acquittal as a motion for a new trial and granted a new trial based on conflicting evidence. However, the trial record plainly reveals that Reed sought an advisory instruction to acquit after resting his case-

 

in-chief and that he argued only that there was no evidence against him. We conclude that Reed has not demonstrated that the district court abused its discretion by denying his motion for an advisory instruction, *see* NRS 175.381(1); *Middleton v. State*, 114 Nev. 1089, 1105, 968 P.2d 296, 307 (1998) ("The granting of an advisory instruction to acquit rests within the sound discretion of the district court."), or by failing to construe his motion as a motion for a new trial, *see generally* NRS 176.515(1).[1]

*Inadequate resources to prepare a defense*

Reed claims that the district court erred by failing to provide him with adequate resources to prepare his own defense. Reed chose to represent himself pursuant to *Faretta v. California*, 422 U.S. 806, 819-20 (1975). "*Faretta* holds that the rights guaranteed by the sixth amendment are personal to the accused. The rights to notice, confrontation, and compulsory process mean, at a minimum, that the time to prepare and some access to materials and witnesses are fundamental to a meaningful right of representation." *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985) (internal quotation marks omitted). The record reveals that the district court thoroughly canvassed Reed regarding the dangers and disadvantages of self-representation. When Reed insisted on representing himself, the district court appointed stand-by counsel to assist Reed at trial, help with discovery, and subpoena witnesses; appointed multiple investigators to interview witnesses and help with discovery; ordered the

---

[1]We note that the district court did not and could not rule on Reed's post-verdict motion for a judgment of acquittal because it was untimely filed and thereby deprived the district court of jurisdiction to act. *See* NRS 175.381(2) ("The motion for a judgment of acquittal must be made within 7 days after the jury is discharged . . . .").



State to verify that Reed had been provided with all of the discovery; ordered the county jail to give Reed one hour per day to prepare his defense;[2] conducted numerous status hearings to address Reed's pretrial motions and ensure that he had access to the materials that he needed; and granted several of Reed's motions for continuances. We conclude that Reed was provided with adequate resources to prepare his defense and that his specific assertions to the contrary are without merit.

*Brady violation*

Reed claims that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide adequate discovery and/or exculpatory materials. He states that the majority of the evidence that the State provided was in the form of audio recordings that were not transcribed. He further asserts that he was unable to impeach the State's key witness because one of the police interviews with that witness had not been transcribed. However, *Brady* is a disclosure rule and not a discovery rule. "Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985) (footnote omitted). Because Reed has not demonstrated that the State failed to disclose favorable evidence, *see State v. Huebler*, 128 Nev. ___, ___, 275 P.3d 91, 95 (2012) (explaining the requirements for establishing a *Brady* violation), *cert. denied*, 568 U.S. ___, 133 S. Ct. 988 (2013), and the State was not required to provide its

---

[2]Seventeen months before his trial, Reed was sentenced to a prison term of 24 to 72 months for possession of a dangerous weapon by a prisoner and was transferred from the county jail to the Northern Nevada Correctional Facility where he had access to a law library.

disclosure in a specific medium or format, *see generally United States v. Odman*, 47 Fed. App'x. 221, 226 (4th Cir. 2002) (the government's failure to provide transcripts of its witnesses' prior testimony did not violate *Brady* because *Brady* rule does not apply when the evidence is available to the defendant through other sources), we conclude that there was no *Brady* violation.

*Juror misconduct*

Reed claims that the district court erred by allowing a juror who expressed obvious bias to remain on the jury. However, Reed did not preserve this issue for appellate review, so we review for plain error. *See* NRS 178.602; *Gallego v. State,* 117 Nev. 348, 365, 23 P.3d 227, 239 (2001) (reviewing unpreserved claims for plain error), *abrogated on other grounds by Nunnery v. State*, 127 Nev. ___, ___ n.12, 263 P.3d 235, 253 n.12 (2011). "In conducting plain error review, we must examine whether there was error, whether the error was plain or clear, and whether the error affected the defendant's substantial rights." *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003) (internal quotation marks omitted). The record reveals that the district court advised the parties about a juror note that stated, "Judge: Please ask the defendant to get to the point. His stock is falling fast." The district court and the parties determined that the proper remedy was to bring the juror in, advise him that the court had received his note, acknowledge that the pace of a trial can be slow, and ask him whether he can continue to be fair and impartial. Thereafter, the juror told the district court that he could remain fair and impartial to both parties, neither party had any questions for the juror, and the juror was returned to the jury without objection. We conclude that this record does not demonstrate error.

*Hearsay and speculative testimony*

Reed claims that the district court erred by admitting hearsay statements into evidence. "Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted and is inadmissible unless [it falls] within an exemption or exception." *Coleman v. State*, 130 Nev. ___, ___, 321 P.3d 901, 905 (2014) (internal quotation marks and citation omitted). Reed claims that the following statements were hearsay and inadmissible:

First, Detective Jenkins testified that he felt that Holmes was beginning to open up during a police interview because he made qualified denials when responding to the last questions and said something like, "I can't say anything because I'm the only one." The district court overruled Reed's objection without identifying the grounds for its ruling. We conclude that Holmes' statement was admissible because it was not offered to prove the truth of the matter asserted but rather to show why the detective believed that Holmes was beginning to open up. *See* NRS 51.035.

Second, Joshua Fort testified that Holmes' demeanor on the night of the murder was, "Nervous. He was trying to get in contact with [Richardson] pretty bad, saying -- saying that he needed to leave." The district court overruled Reed's objection without identifying the grounds for its ruling. We conclude that Holmes' statement was admissible under the "then existing state of mind" exception to the hearsay rule. NRS 51.105(1).

Third, Detective Chalmers testified that he asked Holmes "when [was] the last time he had been to Reno" and Holmes answered that "he had never been to Reno." Reed objected on hearsay grounds and the

district court overruled his objection without identifying the grounds for its ruling. We conclude that Holmes' statement was admissible because it was not offered to prove the truth of the matter asserted but rather to show that Holmes tried to conceal the existence of the conspiracy. *See* NRS 51.035(3)(e); *Holmes v. State*, 129 Nev. ___, ___, 306 P.3d 415, 422 (2013) (the coconspirator exception to the hearsay rule extends to affirmative acts of concealment).

Fourth, Detective Chalmers testified that the warrant for Reed's arrest contained "Holmes' denials of knowing people [the detective] knew him to know." Reed objected on hearsay grounds and the district court overruled his objection without identifying the grounds for its ruling. We conclude that Holmes' statement was admissible to show his affirmative attempt to conceal the conspiracy. *See* NRS 51.035(3)(e); *Holmes*, 129 Nev. at ___, 306 P.3d at 422.

Reed further claims that the district court erred by admitting speculative testimony into evidence. Detective Chalmers testified that based on his investigation he had reason to believe that Holmes knew Reed. Reed did not object to this testimony and we conclude that he has not demonstrated plain error because there was no error—the detective gave an opinion that was based on his perception of his investigation and helpful to "the determination of a fact in issue." NRS 50.265 (opinion testimony); *Gallego*, 117 Nev. at 365, 23 P.3d at 239 (reviewing unpreserved claims for plain error).

*Impeachment evidence*

Reed claims that the district court erred when it allowed the State to introduce the preliminary hearing testimony of an unavailable witness but refused to allow him to impeach that witness's preliminary

hearing testimony with videotape evidence. "We review a district court's decision to admit or exclude evidence for an abuse of discretion." *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008).

The record reveals that Reed moved to introduce a videotape of Richardson's first police interview into evidence. Reed stated that he wished to impeach Richardson's preliminary hearing testimony with the inconsistent statements that Richardson made during that interview. The State responded that there were three police interviews and that it would seek to have all of the interview videotapes admitted to show that Richardson's statements became consistent as the interviews progressed. The State further indicated that Reed's defense counsel had this information when he cross-examined Richardson during the preliminary hearing. The district court refused to rule on Reed's motion until it had reviewed the three videotapes.

The district court subsequently informed Reed that this court had previously ruled, "if the declarant testifies at trial, or at a hearing, and is subject to cross-examination, then you cannot bring in extra judicial statements later." The district court told Reed that it did not believe that Richardson's prior inconsistent statements were admissible, it provided Reed with a copy of *Kaplan v. State*, 99 Nev. 449, 663 P.2d 1190 (1983), and it asked Reed to read the case so that he could argue the matter. The district court further noted that Richardson was no longer unavailable and offered to recess the trial so that Richardson's presence could be secured and Reed could examine him for impeachment purposes. The district court also asked Reed if he wished to examine Detective Chalmers regarding Richardson's inconsistent statements. Reed affirmatively declined to read the case or to examine Richardson and Chalmers for

impeachment purposes. We conclude that this record does not demonstrate that the district court abused its discretion by excluding the videotape evidence.

*Witness vouching*

Reed claims that "the district court erred by allowing a State's witness to vouch for the credibility of another State's witness who was not subject to cross-examination at trial."

Detective Chalmers testified about the letters that Reed wrote while he was in the county jail. In one letter, Reed wrote "that he just received word that [Richardson] may not testify against him and that he thinks that is extremely relevant that he won't testify and that he may be out by his next court date." Chalmers' stated that this letter was important to his investigation because "it provides credibility to Jaffar Richardson. . . . Because Mr. Reed notes in the first letter that without [Richardson] there are no live witnesses. It shows me that he is concerned about what Mr. Richardson's testimony is going to be."

Reed did not timely object to this testimony on witness vouching grounds, so we review for plain error. *See* NRS 47.040(1)(a); *Kelly v. State,* 93 Nev. 154, 156, 561 P.2d 449, 449-50 (1977). We conclude that Reed has not demonstrated plain error because the alleged error does not appear plainly on the record—the record indicates that the detective was merely trying to explain why Reed's letters were important to his investigation.

*Cumulative error*

Reed claims that cumulative error deprived him of a fair trial and requires reversal of his conviction. However, Reed has failed to

demonstrate any error, and we conclude that he was not deprived of a fair trial due to cumulative error.

Having concluded that Reed is not entitled to relief, we ORDER the judgment of conviction AFFIRMED.

_____Pickering_____, J.
Pickering

_____Parraguirre_____, J.
Parraguirre

_____Saitta_____, J.
Saitta

cc: Hon. Janet J. Berry, District Judge
Law Office of Thomas L. Qualls, Ltd.
Attorney General/Carson City
Washoe County District Attorney
Washoe District Court Clerk